**Derrean GRESHAM and Metro Fair Housing Services,**
**Plaintiffs-Appellees,**

v.

**WINDRUSH PARTNERS, LTD., d/b/a Windrush Apartments, Leo Management Company, Thomas L. Williams, and Tena McGill, Defendants-Appellants.**

No. 83–8504.

United States Court of Appeals,
Eleventh Circuit.

April 27, 1984.

John W. Gibson, James B. Deal, Atlanta, Ga., for defendants-appellants.

Gordon L. Joyner, Atlanta, Ga., for plaintiffs below; on appeal, Gordon L. Joyner, Atlanta, Ga., for plaintiff-appellee Derrean Gresham.

Donald P. Edwards of Thomas, Kennedy, Sampson & Edwards, Atlanta, Ga., for plaintiff-appellee Metro Fair Housing Services.

Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

In this appeal we are asked to determine the propriety of a preliminary injunction that, in essence, requires defendants-appellants, who are the developers and managers of a large apartment complex in Decatur, Georgia, known as Windrush Apartments, to conform to the requirements of various fair housing laws. For the reasons stated herein we affirm entry of the preliminary injunction, with the minor modifications set forth below.

## I. BACKGROUND

We set forth the facts in this case in detail, largely as they were found by the district court. On January 31, 1983, plaintiff-appellee Derrean Gresham, a black female, called the rental office at Windrush Apartments, a federally subsidized residential complex in Decatur, Georgia, to ask whether applications were being accepted for two bedroom, "Section 8" apartments.[1] Defendant-appellant Tena McGill, the resident manager at Windrush, answered Gresham's call, told Gresham that she was too busy to talk right then, and told Gresham to call back later. Gresham called again later in the day and received a similar response from McGill. Gresham then told McGill that she would come in person to fill out an application.

At noon that same day Gresham went to the leasing office, accompanied by three other persons, all of whom were black. McGill offered all of them, including Gresham, applications for apartments at Windrush. Gresham and Carolyn Smith, one of the individuals with Gresham, asked whether one and two bedroom units were available under the Section 8 program. McGill said that such units were available. She did not offer to show them around the complex.

While at the leasing office Smith sought to apply for a one bedroom Section 8 apartment but was informed by McGill, after partially completing her application form, that the only one bedroom units still available were reserved for handicapped individuals. Gresham sought to apply for a two bedroom unit, after asking McGill whether that was an appropriate size for a mother and two children. McGill told Gresham that her employment and income had to be verified by her employer prior to qualification for a subsidized apartment. McGill also told Gresham that she would have to submit her children's birth certificates, but McGill did not tell Gresham when to provide them. McGill did not offer to calculate the amount that Gresham's Section 8 rent would be at Windrush Apartments.

---

1. Section 8 of the National Housing Act of 1937, as amended, 42 U.S.C. § 1437f, provides rent subsidies for low income families in apartment units constructed with the help of federal funds. Windrush Apartments contains 202 units, consisting of one, two, and three bedroom apartments. Forty-one of these units are Section 8 apartments. The first "conventional," that is, non-Section 8, apartments were available for occupancy in October or November 1982. The first section 8 units were available for rental on February 1, 1983. As of March 24, 1983, 114 apartments, including both conventional and Section 8 units, had been rented. Of this total, 86 (75%) were rented to whites, 19 (17%) to blacks, and 9 (8%) to orientals. No separate breakdown was provided for the Section 8 units alone. The population of the complex's immediate neighborhood is estimated to be 90% white and 10% black.

McGill suggested that Gresham call if she did not receive notification regarding the status of her application within the following two weeks. On the next day, February 1, 1983, McGill mailed an employment verification form to Gresham's employer, the Stadium Hotel in Atlanta.

During the following two weeks, Gresham telephoned McGill several times to ask about the status of her application. McGill always replied that the processing was not completed and that she was waiting for information to be returned through the mail.

On February 17, 1983, Gresham once again called the rental office and asked whether she could do anything else to expedite her qualification for Section 8 housing. McGill told her that copies of the birth certificates of her children were needed for her file and that Gresham could bring them into the office. The two also discussed some missing forms—Gresham understood that her entire application had been lost, but McGill claims she told Gresham that only the employment verification form had been misplaced.

Gresham, under the impression that defendants had lost her rental application, went to the rental office that same day to complete another application. When Gresham arrived at the rental office, McGill informed her that she had found the application, but that now she needed birth certificates for Gresham and her two children, the telephone number of Gresham's previous resident manager, and one more employment verification form from her employer. Deviating from Windrush's ordinary procedure, McGill gave Gresham the employment verification form to hand-carry to her employer. McGill advised Gresham, however, that the form had to be mailed in by her employer, not by Gresham. Gresham returned to the rental office later that afternoon to deliver the birth certificates and other information to McGill.

Gresham testified that when she returned with the birth certificates, McGill told her that the office's photocopying machine had broken down and that she could bring them back later. To facilitate the long-delayed completion of her application, however, Gresham told McGill to keep the birth certificates and that she would pick them up later. According to McGill, the photocopying machine was inoperable on that day because the rental office had just been moved from its previous location in the apartment model to the apartment clubhouse. At that time a proper electrical outlet for the machine had not yet been installed in the new rental office and McGill was unable to make copies of Gresham's children's birth certificates. Although McGill testified that she apologized for the apparent loss of the employment verification form, Gresham stated that she received no such apology. That same day the original employment verification form from Gresham's employer arrived in the mail in an envelope postmarked February 15, 1983. Apparently, the form had not been lost after all.

At about the same time in February, McGill became aware that there were ten applicants who had completed the required processing and were qualified for Section 8 two bedroom units, but that there were only five Section 8 two bedroom units available. McGill, who had no previous Section 8 housing experience, requested that her supervisor, Loretta Smith, who had experience with rental of Section 8 housing, select five persons or families for immediate tenancy in the available two bedroom Section 8 units.

Smith explained the selection procedure at the preliminary injunction hearing, stating that after Windrush had received more applications than it had apartments in each category of Section 8 units—one, two, and three bedroom apartments—she reviewed all of the applications and other documents in each applicant's file, none of which indicated the applicant's race. She then selected for immediate occupancy the tenants who appeared to have the most favorable rental histories and credit references. After the initial tenants were selected, Smith created waiting lists for each category and sent "waiting list letters" to persons whose

applications showed probable financial qualification for Section 8 assistance and whose verification forms had been received. Smith also sent waiting list letters to persons for whom employment verification forms or credit references had not been received, if those applicants appeared likely to qualify in view of the information available.

Applicants were placed on the waiting list in chronological order based on the initial date of submission of each application. Smith testified, however, that when a Section 8 unit becomes available in the future, she may select not the next applicant on the list, but the applicant whose rental history and credit references make the latter a "more acceptable" tenant.

On February 23, 1983, Smith selected the five applicants whom she deemed most qualified for the available two bedroom, Section 8 apartments and instructed McGill to notify them of their selection as Section 8 tenants. Of the five applicants selected, one was black and four were oriental. The racial makeup of the persons who were not selected is not known. Gresham, who was not among those selected, was notified by telephone that same day that she had been placed on the waiting list for two bedroom apartments. A waiting list letter was mailed to Gresham on March 11, 1983.

Although Gresham was not notified of her failure to be selected as a Section 8 tenant at Windrush until February 23, her experience in attempting to complete her application on February 17 convinced her that she was being given the "run-around" by McGill. As a result, Gresham contacted plaintiff-appellee Metro Fair Housing Services (Metro) on February 17. Metro is a nonprofit corporation devoted to the promotion of integrated housing in metropolitan Atlanta. Metro operates a housing counseling service and a referral service, as well as investigates complaints concerning housing discrimination.

Following Gresham's complaint, Metro sent various white and black testers, first to "test" and then to "audit" Windrush Apartments for racially discriminatory housing practices. Testing and auditing are common methods used by Metro to investigate claims of fair housing violations. Metro conducts a test for possible race discrimination by selecting a tester whose race is different from that of the person who has complained of discrimination. Metro instructs the tester to give particular information similar to or the same as the credentials of the complainant. The tester then applies for the same housing and reports the results to Metro, who compares the report with the complainant's story to determine whether the latter was denied housing on racial grounds. Auditing is a form of testing commonly employed in cases involving large rental complexes or steering by brokers. Metro conducts an audit by performing a number of similar tests. In each test during an audit, applicants of different races but similar credentials are sent at approximately the same time to the broker or rental agent suspected of discriminating against a complainant.

Testers for Metro receive ten dollars for each test performed, but do not share directly in any judgments obtained by Metro. As part of their training, testers are instructed to look in offices for the fair housing poster that must be displayed, pursuant to 24 C.F.R. part 110, by all persons who provide federally subsidized housing. When sent out to perform a test, a tester is not told to look for any specific things other than the fair housing poster.

Two testers visited Windrush Apartments on February 17, 1983. Peggy Fiskum, the white tester, arrived at the complex around noon and was greeted pleasantly. She inquired about two bedroom units, but did not ask about Section 8 housing. Nevertheless, Loretta Smith volunteered information about the lower-rental Section 8 two bedroom units, told Fiskum that several such units were still available, and further told her, "We want nice people in them." Although Fiskum had expressed no interest in a Section 8 unit, Smith and McGill asked her immediately for income information and performed calculations at

that time to determine whether she and her husband would qualify for a Section 8 two bedroom apartment.

The rental agents also encouraged Fiskum to return later that day with her husband because few units were left. Fiskum was not told how long qualification for an apartment would take, but she was told to hurry if she wanted an apartment. Fiskum was in the rental office for at least twenty minutes, and while there looked for but did not see the required fair housing poster. Fiskum testified that she heard no racially discriminatory remarks from either rental agent.

That same day, Della Burroughs, the black tester, inquired at Windrush as to the availability of rental units and was shown a model apartment by Smith. While they were in the model unit, Burroughs asked what the rental hours were so she could return with her husband. Smith did not answer then, but once they had returned to the rental office, Smith told her the office hours and handed her an application. At some time during Burroughs's visit, Smith asked her where she and her husband worked. At no time, however, did Smith bring up the subject of the availability of Section 8 apartments, ask what type of work Mr. and Mrs. Burroughs performed for their employers, inquire as to their incomes, or encourage Burroughs to hurry back. Like Fiskum, Burroughs looked for but could not find the fair housing poster.

During the first and second weeks of March, six testers from Metro visited the rental office at Windrush Apartments. Sarah Buckingham, a white tester, was told that Windrush had two-bedroom units available. Section 8 housing was not mentioned during her visit, and no one asked her about her income or employment. She looked for but did not see the fair housing poster. Priscilla Casamayor, a black tester, also looked for the fair housing poster but saw none. Neither her income nor her employment was discussed.

Jerry Abernathy, a white tester, asked specifically about Section 8 housing, was told that none of the Section 8 units would be expected to become available soon, but was offered an application. He saw no fair housing poster. Wilbert McCree, a black tester who is also employed by Metro as a counselor, was likewise told that no Section 8 units were likely to be available in the near future. When he asked whether he could put an application on file, he was told that doing so would probably be useless. Like the others, he saw no fair housing poster.

During that time, Peggy Fiskum returned to the apartment complex and was told that the Section 8 units had been filled. Nevertheless, she was told that she could fill out an application. She once again attempted to locate the fair housing poster but did not see one.

Marcia Borowski, the executive director of Metro, also visited Windrush Apartments as a white tester. In part, she went to determine whether any conventional rental units remained available at Windrush Apartments that, in the event of a lawsuit, could be set aside for Gresham. She testified that she was shown both two and three bedroom units and was strongly encouraged to apply for an apartment. Neither Borowski nor the rental agent with whom she spoke, Edna Pritchard, mentioned Section 8 housing.

Based on the results of its testing Metro decided to support Gresham in bringing this lawsuit. In her complaint and request for a preliminary injunction Gresham alleges that the defendants refused to rent a Section 8 apartment to her because she is black, in violation of 42 U.S.C. §§ 1981 and 1982, the Federal Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, and the thirteenth amendment. On its own behalf, Metro claims that defendants have engaged in racially discriminatory housing practices that have frustrated and taxed Metro's counseling and referral services, causing an attendant drain on resources. Moreover, Metro asserts that the defendants' practices have deprived Metro's members of the benefits of living in an integrated community free of housing discrimination.

Following a preliminary injunction hearing on March 24–25, 1983, the district court granted in part and denied in part plaintiffs' motion for preliminary relief. The district court found that plaintiffs showed a substantial likelihood of success on their claim that defendants had acted in a racially discriminatory manner in their operation of Windrush Apartments, but that plaintiffs failed to establish that race discrimination was a significant factor in the denial of a Section 8 apartment to Gresham. In particular, the district court found that defendants had failed to display the fair housing poster in the manner required, and that defendants had given prospective white tenants encouragement that had not been given to blacks who came by the Windrush rental office. Additionally, the district court found that defendants had failed to comply with federal regulations requiring that they have a marketing plan whereby they attempt to make the availability of Section 8 housing known within the black community. *See* 24 C.F.R. §§ 200.620(a), 200.625. Moreover, defendants failed to ensure that the employees of Windrush were instructed, orally and in writing, in the federal policy of nondiscrimination and fair housing. *See* 24 C.F.R. § 200.620(c).

The district court entered the following injunction:

> It is therefore ORDERED that defendants Windrush Partners, Ltd., and Leo Management Company, their officers, employees, agents, and successors, and all persons acting in concert or participation with any of them, and in particular defendants Thomas L. Williams and Tina McGill, are ENJOINED from
>
> (1) Discriminating against any person in the terms, conditions, or privileges of the rental of any apartment at Windrush Apartments because of race;
>
> (2) Actively encouraging or soliciting any white person as a tenant at Windrush Apartments unless equal encouragement or solicitude is afforded to all black persons who inquire as to the availability of housing at Windrush Apartments; and
>
> (3) Failing to display the required fair housing poster in a prominent location in each and every room at Windrush Apartments in which the defendants, their agents, and employees provide information about, answer inquiries in regard to, or receive applications for housing at Windrush Apartments.

Defendants promptly appealed from this injunction.

## II. ISSUES

■■■ Windrush raises two main issues in this appeal.[2] The first is whether the district court erred in finding the requisite "irreparable injury" necessary for the issuance of a preliminary injunction. The second is whether the injunctive relief ordered in this case is overbroad in some respects, and so lacking in specificity as to be unenforceable in other respects. Although we affirm the district court on the propriety of issuing a preliminary injunction, we have modified the injunction to provide greater specificity.

## III. DISCUSSION

### A. *The Finding of Irreparable Injury*

Because a preliminary injunction is an extraordinary remedy, a motion for such relief will be granted only if the movant

**2.** Windrush raises several other issues that we believe need no extended discussion. One is whether the trial court abused its discretion in granting the preliminary injunction. Although a preliminary injunction is "extraordinary" relief, the grant or denial of such relief rests within the sound discretion of the district court. *See Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir.1983). For the reasons stated in our discussion of the first issue in the text, below, we find no abuse of that discretion here. The other issue is whether the trial court's finding that Windrush engaged in the racially discriminatory housing practice of encouraging whites who inquire about subsidized housing but not encouraging blacks in similar situations is clearly erroneous. We find that the evidence in the record supports the district court's conclusion, and we are not left with "a definite and firm conviction that a mistake has been committed," *Marable v. H. Walker and Associates*, 644 F.2d 390, 391, 395 (5th Cir. 1981). Therefore, the district court's finding is not clearly erroneous.

satisfies a showing of four prerequisites: (1) a substantial likelihood that the movant will prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction would not be adverse to the public interest. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir. 1983). The district court found that plaintiffs had met each of these prerequisites with respect to part of the relief they requested. Appellants contend that the district court erred in finding that plaintiffs had satisfied the irreparable injury requirement of the showing necessary to obtain a preliminary injunction.

In finding irreparable injury, the district court stated, "[T]he strong national policy against race discrimination in housing leads the court to conclude that once a plaintiff has demonstrated the likelihood of success on the merits of a claim of housing discrimination, irreparable injury must be presumed. *See Banks v. Pe[r]k*, 341 F.Supp. 1175 (N.D.Ohio 1972), *aff'd in part and rev'd in part*, 473 F.2d 910 (6th Cir.1973) (mem.)." Appellants contend that such a presumption is incorrect, and that plaintiffs seeking a preliminary injunction against housing discrimination must separately show irreparable injury after they show a substantial likelihood that discrimination occurred.

■ We agree with the district court that irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes. In *United States v. Hayes International Corporation*, 415 F.2d 1038, 1045 (5th Cir.1969), the old Fifth Circuit[3] held that, "Where ... an injunction is authorized by statute and the statutory conditions are satisfied ... the usual prerequisite of irreparable injury need not be established and the agency to whom the enforcement of the right has

been entrusted is not required to show irreparable injury before obtaining an injunction." [citations and footnote omitted]. The *Hayes International* court went on to state that "irreparable injury should be presumed from the very fact that the statute has been violated." *Id.; accord Atchison, Topeka and Santa Fe Railway Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir.1981); *Heublein, Inc. v. Federal Trade Commission*, 539 F.Supp. 123, 128 (D.Conn.1982); *U.V. Industries, Inc. v. Posner*, 466 F.Supp. 1251, 1255–56 (D.Maine 1979); 7 Moore's Federal Practice, § 65.04(1) n. 7b. In the case at hand the district court found certain specific violations of the regulations implementing the Fair Housing Act. The Act and its regulations prohibit certain discriminatory practices without regard to their actual effect on the community. We hold that when a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations. *See, e.g., TOPIC v. Circle Realty*, 377 F.Supp. 111, 114 (C.D.Cal.1974), *rev'd on other grounds*, 532 F.2d 1273 (9th Cir. 1975), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976).

Moreover, we believe that when housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination. Appellants mistakenly argue that such a presumption does away with the requirement of irreparable injury. Nothing could be further from the truth. A presumption, as used in a case such as this, is merely an evidentiary technique used to apportion the burdens at trial and to maximize the efficiency of the judicial process. Such a presumption, may, of course, be rebutted by evidence that any injury that may occur is not irreparable. Thus, the real question in this case is whether the presumption of irreparable injury logically follows from a showing of a

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

substantial likelihood that illegal discrimination has occurred.

Discrimination in housing, when proved, almost always results in irreparable injury. *See Vietnamese Fishermen's Association v. Knights of the Ku Klux Klan,* 543 F.Supp. 198 (S.D.Tex.1982) ("Victims of discrimination suffer irreparable injury, regardless of pecuniary damage."); *cf. Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (showing probability of success on merits that first amendment rights violated sufficient to show irreparable injury because loss of first amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury) (Brennan, J., joined by White and Marshall, JJ., in plurality opinion); *Ostrowski v. Local 1–2, Utility Workers Union of America, AFL–CIO,* 530 F.Supp. 208 (S.D. N.Y.1980) (loss of first amendment freedoms for even minimal periods of time constitutes irreparable injury). Several reasons explain why housing discrimination results in irreparable injury. First, a person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that housing is found, even if in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.

■ Second, in a case such as this one, the available housing where the discrimination is occurring could become filled during the pendency of a lawsuit, making corrective relief nearly impossible to enter— clearly, a court lacks the authority to order innocent white tenants to vacate apartments to remedy discrimination against blacks or other minorities by the apartment management. Thus, preliminary injunctive relief may be necessary to insure that a remedy will be available. Third, monetary relief cannot correct the injury completely. In *Banks v. Perk* the court recited a litany of irreparable harm that occurs whenever housing discrimination occurs. That harm included, "the loss of safe, sanitary, decent and integrated housing; the loss of achiev-

ing integrated schools without the necessity of massive busing; the loss of housing which is accessible to jobs; and the loss of being unable to escape the never-ending and seemingly unbreakable cycle of poverty." 341 F.Supp. at 1185. *See also Zuch v. Hussey,* 394 F.Supp. 1028, 1052 (E.D. Mich.1975) ("steering" and "blockbusting" practices of real estate agents in Detroit area cause irreparable harm). Additionally, as plaintiffs have asserted in this case housing discrimination causes irreparable injury by denying whites, as well as blacks, the benefits of living in an integrated community.

■ In sum, we hold that because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury. There being no evidence in the record tending to rebut this presumption we affirm the district court's conclusion that preliminary relief was appropriate in this case.

B. *The Scope of The Injunction*

Appellants contend that the injunction entered by the district court is too vague for them to be able to comply with its terms without fear that they will inadvertently violate one or more provisions. They also assert that portions of the injunction are overbroad. Although we believe the relatively simple terms of the district court's injunction are quite clear in the context of this litigation, we make some modifications to calm the fears of appellants. Accordingly, the district court's preliminary injunction is amended to read as follows:

It is therefore ORDERED that defendants Windrush Partners, Ltd., and Leo Management Company, their officers, employees, agents, and successors, and all persons acting in concert or participation with any of them, and in particular Thomas L. Williams and Tina McGill, are EN-JOINED from

(1) Discriminating against any person in the terms, conditions, or privileges of the rental of any apartment at Windrush Apartments because of race by actively encouraging or soliciting any white person as a tenant at Windrush Apartments unless equal encouragement or solicitude is afforded to black persons who inquire as to the availability of housing at Windrush Apartments.

(2) Failing to display the required fair housing poster in a prominent location in each room of the rental office at Windrush Apartments in which the defendants, their agents, and employees provide information about, answer inquiries in regard to, or receive applications for housing at Windrush Apartments.

(3) Failing to instruct all employees and agents of Windrush Apartments in writing and orally of the policy of nondiscrimination and fair housing.

The district court's judgment as amended is AFFIRMED.