The VILLAGES OF CORNWALLIS
OWNERS ASSOCIATION, INC.,
et al., Plaintiffs,

v.

DURHAM HOUSING AUTHORITY, and
Henry J. Cisneros, Defendants.

No. 1:95CV149.

United States District Court,
M.D. North Carolina, Durham Division.

July 21, 1995.

Henry W. Jones, Jr., A. Hope Derby, Laura J. Wetsch, Raleigh, NC, for plaintiffs.

Bryan Edward Wardell, Raleigh, NC, Sherrod Banks, Durham, NC, Gill P. Beck, Office of U.S. Atty., Greensboro, NC, for defendants.

MEMORANDUM OPINION

TILLEY, District Judge.

Plaintiffs, the Villages of Cornwallis Owners Association and several individuals, filed this suit in state court seeking an order enjoining Durham Housing Authority and HUD from developing a low income housing project on a particular site in Durham. Defendants removed the action to this Court on March 2, 1995. The case comes before the Court on Plaintiffs' motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. For the reasons discussed below, Plaintiffs' motion for a preliminary injunction is DENIED.

### I.

The facts, which are largely undisputed, are as follows: On July 13, 1990, the Durham Housing Authority (DHA) submitted an application to the Greensboro Field Office (Greensboro office) of the United States Department of Housing and Urban Development (HUD) for the development of forty units of public housing in Durham, North Carolina. DHA submitted several site proposals for various sites in Durham, all of which were rejected by the Greensboro office. On April 8, 1994, DHA formally submitted a proposal for constructing forty units of public housing on property located at the juncture of North Carolina Highway 55 and Cornwallis Road ("the Site") in Durham. The Site had been the subject of several preliminary reviews by Greensboro. The Site was approved on January 10, 1995 after a finding by Joseph Shuldiner, HUD's Assistant Secretary for Public and Indian Housing, that the Site met HUD's Site and Neighborhood Standards.

### II.

Plaintiffs have moved for a preliminary injunction against any further action by HUD and DHA in developing the Site. To challenge an action in federal court, litigants must have standing. At the pleading stage of a case, general factual allegations will suffice to establish standing, while at summary judgment, the allegations must be supported with specific facts. *Lujan v. Defend-*

*ers of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Accordingly at this preliminary stage, the Court will not engage in a protracted analysis of Plaintiffs' standing to challenge the actions of HUD and DHA. However, it should be noted that plaintiff, the Villages of Cornwallis Owners Association ("the Association"), may have a higher burden to meet than the individual plaintiffs who are residents and property owners in the area surrounding the Site.

■ An organization may gain standing in either of two ways. First, an organization may sue on its own behalf if it shows injury to itself. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). In this case, the complaint does not contain any allegations that the Association will be injured in its own right by the DHA project.

■ Second, an organization may also sue on behalf of its members. The Supreme Court established a three part test for organizational standing in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). An association has standing to bring an action on behalf of its members if 1) the members would otherwise have standing to sue in their own right, 2) the interests the organization seeks to protect are germane to the organization's purpose, and 3) neither the claim or the relief sought requires the participation of the individual members. *Id.* at 343, 97 S.Ct. at 2441. A preliminary examination of these factors indicates a weakness in the Association's ability to meet the second prong. The complaint alleges "[t]he primary purpose of the Association is to perform the duties and obligations of the Homeowners Association as set forth in the certain Declaration of Covenants, Conditions and Restrictions [as recorded in the Register of Deeds' office]." This allegation does not address whether one of the Association's purposes is to prevent an undue minority concentration in the area surrounding the neighborhoods represented by the Association. Because this case is at a preliminary stage and no problem appears to be present with regard to the individual plaintiffs, the Court will proceed to address the motion as presented by all Plaintiffs.

### III.

In *Direx Israel v. Breakthrough Medical Corp.,* 952 F.2d 802 (4th Cir.1991), the Fourth Circuit elucidated the framework under which a motion for a preliminary injunction should be analyzed. *Direx Israel* requires analysis of four factors: (1) the irreparable harm to the plaintiff if an injunction is not granted, (2) the likelihood of harm to the defendant if an injunction is granted, (3) the likelihood that the plaintiff will succeed on the merits, (4) and the public interest. *Id.* at 812. The plaintiff bears the burden of proof on these factors. *Id.* The irreparable harm to the plaintiff and the potential harm to the defendant are the two most important factors. Indeed, without a clear showing of actual and imminent irreparable harm, the inquiry need proceed no farther. *Id.* at 812 (citations omitted).

### A. Irreparable Harm to Plaintiffs

■ The first factor to be considered in evaluating whether a preliminary injunction should issue is the likelihood of irreparable harm. *Direx Israel,* 952 F.2d at 812. Plaintiffs have the burden of making a clear showing that absent the injunction, they will suffer irreparable harm. *Id.*

■ In arguing that they will suffer irreparable harm if an injunction does not issue, Plaintiffs cite *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417 (11th Cir.1984). *Gresham,* an Eleventh Circuit case, holds that irreparable harm may be presumed from a showing of discrimination and violations of fair housing statutes. *Id.* at 1423. The Eleventh Circuit stated that discrimination in housing almost always produces irreparable injury. The court noted that a person who has been discriminated against must still find housing, that due to the housing market the available housing could become full, rendering the court powerless to deliver relief, and that monetary relief cannot remedy completely the loss of safe, decent, integrated housing. *Id.* at 1424.

■ This case differs from *Gresham* on both legal and factual grounds. First, under Fourth Circuit precedent, a court must examine irreparable injury before the merits are examined. In contrast, the standards discussed in *Gresham* do not appear to require the same sequential analysis dictated by *Direx Israel*. Second, in terms of factual comparisons, the plaintiff in *Gresham* was a black female attempting to locate subsidized housing. She was turned away from an apartment complex due to her race and was concerned that she would not be able to locate subsidized housing in an integrated area. In this case, Plaintiffs fear a diminution in their property values and decreased safety. They have housing and would suffer no harm from the project until it is completed. The rationale behind the Eleventh Circuit's statement that a violation of the housing laws almost always results in irreparable harm does not apply to Plaintiffs in this case.

Although this Court declines to extend the *Gresham* holding to this case, Plaintiffs have established that they will suffer irreparable harm if the project continues. If no injunction issues and Plaintiffs prevail on the merits, their victory may be of little avail. If at the time the merits are reached, the project is well under way, if not complete, the ability of the Court to fashion an appropriate remedy may be limited. Issues of public policy, waste, and sovereign immunity may serve as formidable barriers to relief. *See Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, No. 2:95CV00277 (M.D.N.C., June 8, 1995). Accordingly, the Court finds that in the absence of preliminary relief, Plaintiffs would suffer irreparable harm.

## B. Harm to Defendants

■ Under the *Direx Israel* test, after a finding that irreparable harm exists, the inquiry shifts to the second prong: the likelihood of harm to the nonmovant if an injunction is granted. *Direx Israel*, 952 F.2d at 812. The likelihood of irreparable harm to the movant must be balanced against the likelihood that the nonmovant will suffer harm if the injunction is granted. *Id.* If the balance tips decidedly in favor of the movant, the injunction will be granted if the movant has raised serious and substantial questions about the merits. If the balance tips away from the movant, the movant must make a stronger showing on the merits to prevail. *Id.* at 813. Phrased another way, "[t]hus, while a substantial discrepancy in the potential harms would have to be found to favor a party whose potential for success on the merits was no better than even, less discrepancy in relative harms may suffice when that party's chances for success on the merits are probable." *Faulkner v. Jones*, 10 F.3d 226, 233 (4th Cir.1993) (discussing the balance of harms required by *Direx Israel*).

Defendants assert that they will suffer harm should an injunction issue. The property for the site has not been purchased, and the owner may decide not to wait until the conclusion of this litigation to dispose of the property. Additionally, DHA and, to a lesser extent, HUD have expended a great deal of resources in investigating the site and proceeding through the approval process. This investment of time and governmental resources could be wasted if an injunction issues. Defendants have established that they would suffer a great deal of harm if an injunction were to issue.

Both Plaintiffs and Defendants have established that they would suffer harm if the motion for a preliminary injunction is not resolved in their favor. It appears that Plaintiffs' harm would be slightly more severe than that of Defendants. Defendants' harm stems from potential wasted resources, but no evidence exists that Defendants would be unable to locate a site for the project eventually. The balance of the potential harms slightly tips toward Plaintiffs. Thus, in order to prevail, Plaintiffs must establish a probability of success on the merits of the case. *See Direx Israel*, 952 F.2d at 813. "'Probability of success' implies that the plaintiff must have a very clear and strong case." *Id.* at 813 (quoting 2 McCarthy on Trademarks and Unfair Competition, § 30.–16, at 485–86 (2d ed. 1980)).

## C. Likelihood of Success on the Merits

■ The inquiry now shifts to the likelihood of success on the merits. Plaintiffs face a daunting task in challenging the ac-

tions of HUD. The standard of review for reviewing actions of an agency such as HUD is whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. This review should be of a limited nature and should not encompass material outside the administrative record. *Camp v. Pitts*, 411 U.S. 138, 140–142, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). In making its review, a court should discern "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824 (citations omitted). "Although [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824.

■ In this case, the administrative record ("the Record") as filed with the Court must be examined to determine whether HUD's approval of the site was arbitrary and capricious or an abuse of discretion. Initially, it must be noted that an agency's actions are to be presumed proper. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824. Likewise, a court must give great deference to an agency's interpretation of its own regulations. *See Citizens Against the Refinery's Effects v. EPA*, 643 F.2d 178, 181 (4th Cir.1981).

In challenging HUD's selection of the site, Plaintiffs assert that the selection violated HUD's regulations prohibiting the location of housing projects in areas of "minority concentration." Specifically, the regulations, which are entitled "Site and Neighborhood Standards" state that:

the site for new construction projects must not be located in:

(1) an area of minority concentration unless (i) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (ii) the project is neces-

sary to meet overriding housing need which cannot otherwise feasibly be met in that housing market area . . .; or

(2) A racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area.

24 C.F.R. § 941.202(c) (1994). The regulations do not define the term "minority concentration".[1] In 1981, HUD issued a notice, H–81–2, "Clarification of Site and Neighborhood Standards for New Assisted Housing Projects in Areas of Minority Concentration". H–81–2 expired by its own terms on July 31, 1981; however, a copy of H–81–2 was contained in the Record filed with the Court. H–81–2 states that

"Areas of minority concentration" must be defined in relation to local conditions. Any area where the proportion of minority residents substantially exceeds, or, as a result of the construction of new assisted housing, would substantially exceed that of the jurisdiction as a whole should be considered an area of minority concentration.

This criterion is not intended to be applied mechanically or with mechanical precision; reasonable judgment should be exercised. Determinations as to whether or not a site is located in an area of minority concentration need not rely solely on census tract data if those data are clearly out of date and do not accurately reflect the neighborhood racial composition. Moreover, what is "substantial" will vary with the circumstances in the area. A small difference between the proportion of minority residents in an area and in the jurisdiction as a whole may be "substantial" in a jurisdiction with a low percentage of minority residents and a trend toward increasing concentration. The same difference may be insubstantial in a jurisdiction with a high percentage of minority residents where the level of concentration is stable or decreasing.

In applying this criterion, the current racial composition of an area should not necessarily be conclusive. Demographic trends in the area which are brought about by private housing reinvestment, disinvest-

---

1. Neither the exception in (i) nor that in (ii) has been applied in this case.

ment, or other causes and which can be expected to produce changes in the racial composition of the area in the near future must be considered in determining whether an area is one of minority concentration. HUD Notice H–81–2 (R. at 80.) Because a copy of H–81–2 was contained in the Record and both sides appear to advocate its continued validity, the Court will consider H–81–2 as a source of guidance used by HUD in making its determinations.

In this case, the Record reveals that the Site is located in Census Tract 20.10 [2] and that minority persons comprise 59.8% of the population in that tract. The City of Durham has a minority population of 48.2%. The Record contains estimates that after the construction of the project, the minority population of Census Tract 20.10 will increase to 60.5% [3] Within Census Tract 20.10, the Site is located in districts 902 and 905 which have a combined minority population of 36.2%. It is estimated that with the addition of the project, the minority population of these districts would increase to 49.4%. From maps and tables contained in the Record, (R. at 50–63.) it appears that Census Tract 20.10 is divided into four Block Groups, (BG1, BG2, BG3, and BG9). The Site is located in BG9 which had a minority population of 41.7% at the time of the 1990 Census. However, the 1980 Census indicated that BG9 had a minority population of 77.1%.

Additionally, the Record indicates that Census Tract 20.97 borders on Census Tract 20.10 and is very close to the Site. (The Site is located on the east border of Census Tract 20.10.) Census Tract 20.97 has a minority population of 23.1%, and the block groups in Census Tract 20.97 closest to the Site are BG1, minority population 15.1%, and BG9, minority population 24.3%.

The statistical figures, discussed above, are part of the Record, and were presented to various HUD officials. From this data, it does not appear that the Secretary abused his discretion in approving the site. Although the minority population of the entire census tract exceeds the minority population of the City of Durham, HUD investigated further and considered other figures. H–81–2 contemplates that a determination of minority concentration will not depend solely on census tract data. H–81–2 also suggests that demographic trends in relevant areas should be considered. The Record indicates that the census tract data was broken down and analyzed to determine the minority population of the areas nearest the site, both within and outside Census Tract 20.10. The block group in which the Site is located has a minority population of 41.7%, down from 77.1% in the 1980 Census, and the City of Durham has a minority population of 48.2% The analysis of the minority population of the areas surrounding the site did not rely solely on the data from Census Tract 20.10. Rather, demographic trends and geographic distribution of populations relative to the site were considered. This analysis appears consistent with the language of H–81–2.

Plaintiffs assert that the Secretary abused his discretion in determining that the Site is not in an area of minority concentration. The term "minority concentration" is contained in 24 C.F.R. § 941.202(c), and the Secretary's interpretation of this term must be given great deference. *See Citizens Against the Refinery's Effects v. EPA,* 643 F.2d 178, 181 (4th Cir.1981). The term, "minority concentration" is not defined in the regulations, and the only guidance for construing the term is contained in H–81–2. The Secretary did not stray from the language of H–81–2. Given the deference to which the Secretary's interpretation is due and the fact that the decision comports with the guidance offered by H–81–2, it is highly unlikely that Plaintiffs could prevail on this issue on the merits.

Plaintiffs suggest an alternate argument, advocating that the Secretary acted in an arbitrary and capricious manner by failing to consider other relevant evidence. Plaintiffs state that the Secretary should have considered the long term effects of the Site place-

---

2. *Unless otherwise noted, all references to Census data are from the 1990 Census.*

3. *The estimated increase is based on the racial composition of the persons on the waiting list who would receive housing in the Project if it were constructed.*

ment on the minority composition of the surrounding area. According to Plaintiffs, a neighborhood which has reached a minority population of 20–25% will continue to experience growth in minority population until the neighborhood has "tipped" to a predominantly minority neighborhood. Tipping, the theory goes, is caused by the prejudicial reaction of Caucasians to an increased minority population.[4]

In *King v. Harris,* 464 F.Supp. 827 (E.D.N.Y.1979), a district court applied a tipping theory and found that the Secretary acted arbitrarily and capriciously in relying solely on census data and ignoring the evidence of a large minority influx into a neighborhood. *Id.* at 842–43. In *King,* HUD had approved in 1978 the construction of low income housing based solely on an analysis of 1970 census data, which HUD had conceded were outdated. Moreover, HUD did not consider the population figures from four apartment complexes within 3200 feet of the proposed site because the complexes were outside the census tract. *Id.* at 833–34. Each of the complexes had a minority population in excess of 90% Based on these factors, the court found that HUD's approval of a low income project was an abuse of discretion.

This case differs greatly from *King.* As discussed above, in approving the Site, HUD considered the minority population of the surrounding areas without rigid reliance on census tract data. Plaintiffs do not assert that the 1990 data was outdated by the time of approval in January, 1995. Plaintiffs have not presented any evidence of great shifts in the minority population near the Site. Nothing in the Record or Plaintiffs' arguments suggests that HUD capriciously failed to con-

sider relevant evidence. Plaintiffs have not met their burden of establishing a probability of success on the merits against HUD.

Plaintiffs have advanced additional arguments with regard to DHA. Plaintiffs correctly point out that Defendant DHA is not covered by the Administrative Procedures Act, 5 U.S.C. § 706. As such, the review is not limited to the Record. Plaintiffs postulate that DHA has acted arbitrarily and capriciously in choosing and seeking approval of the Site. As Plaintiffs correctly point out, under North Carolina law, housing authorities are given broad discretion in choosing the location of housing projects. *See In re Housing Auth. of City of Salisbury,* 235 N.C. 463, 466, 70 S.E.2d 500, 502 (1952). According to Plaintiffs, DHA acted arbitrarily by repeatedly submitting the Site for review despite prior determinations that the Site was located in an area of minority concentration. Plaintiffs misread the Record.

The Record reveals that on July 22, 1992, Ernest Fulton, the Director of the Fair Housing and Equal Opportunity Division of Greensboro–HUD (FHEO), recommended that the Site be rejected because it was located in an area of minority concentration. As support of this recommendation, Mr. Fulton cited the census data for Census Tract 20.10.[5] Mr. Fulton toured the Site on September 29, 1992. He recommended on November 2, 1992 and again on November 17, 1992, that the site be rejected. Mr. Fulton based his recommendations on his conclusion that the site was located in an area of minority concentration.

On October 13, 1993, James R. Tabron, the Executive Director of DHA, wrote to Michael

---

4. Under Plaintiffs' theory, it would seem that no housing projects could be located in an area with a minority population in excess of 20–25%.

5. At Mr. Fulton's deposition on April 18, 1995, he testified as follows:

> Q. So, in your memoranda giving your recommendation on the site, when you refer to the site being located in an area of minority concentration, that area you are referring to is the census tract as a whole?
> A. Yes.
>
> . . . . .
>
> Q. ... And is it fair to say that your conclusion there [a memorandum in the Record]

> is that the site is located in an area of minority concentration?
> A. Yes.
> Q. And explain the reasoning behind that conclusion.
> A. The reasoning behind it is that the number of minorities within the census tract substantially exceeds the number of minorities within the jurisdiction.

(E. Fulton Dep. p. 88–89.)

Janis, HUD's General Deputy Assistant Secretary, informing him that DHA was appealing Greensboro's denial of the Site. Mr. Tabron stated that the Site is located in a developing part of Durham, near the Research Triangle Park. Mr. Tabron noted that the tract is not very populated and that the addition of the DHA units would raise the minority population from 59.8% to 60.5%.

Mr. Janis responded to DHA's appeal by noting that DHA had not submitted a formal proposal and that the reviews by Greensboro were preliminary. An internal HUD memorandum to Dan McCanless, Director of the Housing Development Division, dated April 21, 1994 stated that the Site is well-removed from concentrations of assisted persons within the census tract and therefore meets "the site and neighborhood standards relating to the promotion of housing choice and avoidance of an undue concentration of assisted persons in low income neighborhoods." Attached to the memorandum was a breakdown of the areas located within one and one half miles of the Site. Southeast of the Site is an area with 3015 residents, 38.9% of which are African–Americans. The area north of the Site has 1,206 residents, 87% of which are African–American while the area northeast of the Site has 588 residents, 6.8% of which are African–Americans. Finally, the area southeast of the Site has 232 residents, 2.5% of which are African–American.

Plaintiffs appear to be suggesting that DHA's decision to appeal the result of Mr. Fulton's preliminary review was arbitrary and capricious. It is evident from the Record and from evidence submitted by Plaintiffs that Mr. Fulton defined "minority concentration" as an area having a greater minority population than the city as a whole. This district has held previously that for the purposes of a preliminary injunction, it may be an abuse of discretion to determine whether a site is in an area of minority concentration based solely on a mechanical, mathematical determination. *See Glendale Neighborhood Ass'n v. Greensboro Housing Auth.,* No. 2:95CV00277 (M.D.N.C., June 8, 1995). Moreover, Plaintiffs cite no case law which would indicate that it is improper for a housing authority to seek review of a preliminary decision. Plaintiffs have not pointed to any evidence which would indicate that the review process utilized with regard to the Site was anything but normal. Plaintiffs have little chance of success on this argument.

Plaintiff's second argument regarding DHA is that the selection of the Site violates federal law because DHA has intentionally and historically selected sites for housing projects in areas of minority concentration. A finding that DHA has historically selected sites for housing projects in areas of minority concentration may be probative of bad faith in the selection process which would lend credence to a finding of an arbitrary and capricious decision. Plaintiffs have not adduced evidence from which a likelihood of success on this point could be predicted. They have not presented facts on the number of housing projects in Durham, the age of the housing projects, or the racial composition of the area at the time the projects were constructed.[6] Additionally, as discussed above, the evidence in the Record suggests that it is not arbitrary to determine that the Site is not located in an area of minority concentration. Plaintiffs have not established that their case is clear and strong enough to be worthy of a finding of a probability of success on their argument that DHA has violated federal law in its selection of the Site.

**D. The Public Interest**

The fourth factor to be considered in addressing whether a preliminary injunction should issue involves analysis of the public interest. *Direx Israel,* 952 F.2d at 812. The public has an interest in the construction of safe, affordable housing for persons of low income. Similarly, the public has an interest in the preventing the creation of segregated

---

6. The maps provided to the Court serve Plaintiffs' arguments well in terms of general trends and patterns. However, an accusation stating that Durham has engaged in a history of intentional race discrimination through site selection merits precise evidence. Maps without scales or compass points and showing less than the whole city will not suffice to support such a serious accusation.

areas. In this case, the public interest factor is neutral and has no effect on the outcome.

Plaintiffs have established that they will suffer irreparable harm if the project is permitted to continue. However, Plaintiffs have shown very little likelihood of succeeding on the merits of this case. They face a stringent standard of review and a presumption of regularity. Plaintiffs have not established that they possess a probability of success on the merits. Thus, they have not met the requirements of *Direx Israel,* and preliminary injunctive relief is not appropriate. Plaintiffs' motion for a preliminary injunction is DENIED.