HAITIAN REFUGEE CENTER, INC., a not-for-profit corporation; Roman Catholic Diocese of Palm Beach; Marie Gizele Angrand; Germaine Cadet; Rosita Delva; Dieumercie Desir; Joseph Saintil Dieudonne; Gerald Henry; Marie France Jean–Philippe; Novamise Julien; Francklin Joseph; Sylvia Lindor; Recol Neus; Rose Pierrecina Lebon Pierre; Marie Philomene Servilien; Hector Trejo Tamayo; Juan Tamayo Vega; Marie Raquel Viera; and Jeanette Vixama, Plaintiffs,

v.

Alan C. NELSON, Commissioner of Immigration and Naturalization Service; Perry Rivkind, District Director, Immigration and Naturalization Service, District Office Number 6; Kenneth Pasquarell, District Director, Immigration and Naturalization Service, District Office Number 26; William Chambers, Director, Immigration and Naturalization Service Regional Processing Facility for the Southern Region; Immigration and Naturalization Service, Department of Justice; Richard Norton, Associate Commissioner for Examination, Immigration and Naturalization Service; William Slattery, Assistant Commissioner for Legalization, Immigration and Naturalization Service; Edwin Meese, III, Attorney General of the United States; and United States Department of Justice, Defendants.

No. 88–1066–Civ.

United States District Court, S.D. Florida.

Aug. 22, 1988.

Ira J. Kurzban, Counsel for National Emergency Civil Liberties Foundation, Miami, Fla., Michael Guare, Florida Rural Legal Services, Inc., Bartow, Fla., Robert Williams, Maureen T. Kelleher, Florida Rural Legal Services, Inc., Immokalee, Fla., Cheryl A.E. Little, Haitian Refugee Center, Inc., Miami, Fla., for plaintiffs.

Patricia Kenny, Asst. U.S. Atty., Miami, Fla., Richard Chamovitz, David N. Bernal, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

ORDER GRANTING MOTION FOR PRE-
LIMINARY INJUNCTION AND
CERTIFYING THE CLASS

ATKINS, District Judge.

THIS CAUSE is before the court on the plaintiffs' motion for a preliminary injunc-

tion. After an extensive hearing at which the parties offered evidence and presented witnesses and after exhaustive briefing, the court concludes that it is vested with jurisdiction to consider this matter and renders this Memorandum Decision in accordance with Fed.R.Civ.P. 52(a). It is further

ORDERED AND ADJUDGED that the plaintiffs' motion is GRANTED.

This action was initiated on behalf of the Haitian Refugee Center ("HRC"), the Migration and Refugee Services of the Diocese of Palm Beach ("MRS"), and 17 individual applicants for temporary residence under the Special Agricultural Workers ("SAW") provisions found at section 210 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1160, as amended by the Immigration Reform Control Act ("IRCA"), Pub.L. 99–603, 100 Stat. 3417.[1] The plaintiffs seek declaratory, mandatory, and injunctive relief for themselves and a class of persons who have applied or will apply for SAW status and who have been or will be denied such status because of the defendants' alleged unlawful practices and policies. The plaintiffs contend that the defendant Immigration and Naturalization Service ("INS") officials have (1) imposed an unlawful burden of proof by requiring applicants to produce corroborating evidence in addition to affidavits to prove the performance of the requisite ninety mandays of agricultural labor, (2) denied the individual plaintiffs' alleged "non-frivolous" applications prior to March 29, 1988, and thus denied work authorization pending final adjudication of the claims contrary to the statute and regulations, (3) issued I–292 notices of denial which failed to state the specific reasons for denial and provided incorrect information for purposes of appeal, and (4) imposed an interview procedure which violates the applicants' Fifth Amendment right to due process by failing to provide interpreters, failing to allow the applicants to rebut adverse evidence, and refusing to allow the applicants to present witnesses on their own behalf.

The plaintiffs seek a preliminary injunction: (1) enjoining the defendants from applying an improper burden of proof to SAW applications; (2) enjoining defendants from utilizing an interview process that is procedurally deficient by failing to allow applicants to clarify information, failing to apprise applicants of adverse evidence with an opportunity to rebut, failing to provide an opportunity to present live witnesses, failing to provide competent interpreters, and failing to make a verbatim transcript; (3) requiring the defendants to readjudicate all SAW applications filed by the plaintiffs using the proper burden of proof; (4) requiring the defendants to readjudicate all SAW applications filed by the plaintiffs and members of the class they seek to represent which were denied at the Legalization Offices prior to March 29, 1988, for lack of work records, precise documentation, or for suspected fraud; (5) requiring the defendants to grant work authorization and stays of deportation to all of the plaintiffs and members of the class they seek to represent whose applications were denied at Legalization Offices prior to March 29, 1988, for lack of work records, precise proof of employment, or suspected fraud; and (6) requiring defendants to renotify and provide specific reasons for denial to those applicants who received denials on form I–292.

## BACKGROUND

The Special Agricultural Workers Program ("SAW") was created by and as part of the Immigration Reform and Control Act of 1986 ("IRCA") and was intended to extend lawful immigrant status to qualifying aliens. The program mandates that the Attorney General adjust the status of any alien to that of an alien admitted for temporary residence if that alien applies for a change in status between June 1, 1987, and November 30, 1988, and is able to establish that s/he has resided in the United States and performed seasonal agricultural services for at least ninety man-days during the twelve month period ending on May 1, 1986. *See* 8 U.S.C. §§ 1160(a)(1)(A) and (B). The applicant must also establish that s/he is admissible to the United States as

---

**1.** IRCA created section 210 of the Immigration and Nationality Act, 8 U.S.C. § 1160.

an immigrant. 8 U.S.C. § 1160(a)(1)(C). An alien who is granted temporary residency under this program will eventually be admitted as a permanent resident. 8 U.S.C. § 1160(a)(2).

The application process begins at one of five Legalization Offices ("LO") located in the state of Florida where the application is reviewed and the applicant interviewed.[2] The interviewing officer either denies the application, recommends that it be denied, or recommends that it be granted. Those applications not denied outright at the LO are forwarded to one of four Regional Processing Facilities ("RPF") for adjudication. A denial that issues either from an LO or from the RPF may be appealed to the Legalization Appeals Unit ("LAU"), the final administrative decision in a SAW applicant's case.[3]

LOs are "local offices of the Immigration and Naturalization Service which accept and process applications for legalization or special agricultural worker status", under the authority of the district directors in whose districts such offices are located." 8 C.F.R. § 210.1(h). At this stage, the interviewing officer determines whether a completed application filed for processing is "non-frivolous."[4] Under subsection (d) of section 210 of the Act, applicants who file a "non-frivolous" case of eligibility for SAW status under subsection (a) shall not be deported or excluded and shall be granted authorization to engage in employment pending final determination of his or her application.[5] Only an LO is authorized to

2. Regulations to implement the SAW provisions were first promulgated on May 1, 1987. 52 Fed.Reg. 16190 *et seq.* and 16195 *et seq.* (May 1, 1987), codified at 8 C.F.R. Parts 103 and 210 (1987). In relevant part, the regulations provide that the application for SAW status must be filed on Form I–700 together with the necessary fee, report of medical examination, evidence of identity, and fingerprint chart. "Each applicant shall be interviewed by an immigration officer" at the appropriate INS Legalization Office, except that the interview may be waived when it is impractical because of the health of the applicant. 8 C.F.R. § 210.2(c)(2)(iv).

3. Whenever a SAW application is denied by the LO or by the RPF, the applicant must be given written notice setting forth the specific reasons for the denial on Form I–692. 8 C.F.R. § 103.3(a)(2). The form must contain advice that the applicant may appeal the decision and that such appeal must be taken on Form I–694 within 30 days of service of the denial notification. *Id.* The appeal with the required fee must be filed with the RPF for consideration by the Associate Commissioner for Examinations (Administrative Appeals Unit ("AAU")). *Id.;* 8 C.F.R. § 210.2(f). If the AAU dismisses the appeal, no further administrative appeal is available nor may the application be filed or reopened before an immigration judge or Board of Immigration Appeals during exclusion or deportation proceedings. 8 U.S.C. § 1160(e)(2); 8 C.F.R. § 103.3(a)(2). The Act does provide, however, for judicial review of an administrative denial of a legalization application by the AAU, but only in the judicial review of an order of exclusion or deportation. 8 U.S.C. § 1160(e)(3).

4. *See* H.R.CONF.REP.NO. 99–1000, 99th Cong., 2d Sess. 85, 97, *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS 5840, 5852.

The Conferees intend that the Immigration and Naturalization Service allow aliens to make a declaration, under penalty of perjury and under such terms and conditions that the Attorney General may by regulation provide, (i) attesting that they have in fact worked the requisite number of man-days required; (ii) identifying the type or nature of documentation they intend to adduce to make the necessary showing, (although this last shall not limit their rights to produce other evidence at a later date), (iii) acknowledging that false statements concerning their eligibility constitute a violation of Title 18 U.S.C., and may make them ineligible for this program and, further, subject to deportation or exclusion, and (iv) identifying their current or immediate past employer(s). *The Conferees intend that INS not go beyond these criteria in seeking to determine whether an alien has made a nonfrivolous case for eligibility. To do otherwise may undermine the purposes of this section, viz., to encourage undocumented workers to come forward and seek to obtain legal status.*

Id. (emphasis added).

5. 8 U.S.C. § 1160(d)(2). The standard for defining "non-frivolous" was endorsed by Congress through an amendment to section 210(d) of the Act, 8 U.S.C. § 1160(d) on December 22, 1987. Pub.L. 100–202, 101 Stat. 1329–18 (Dec. 22, 1987). The new 8 U.S.C. § 1160(d)(3)(B) provides that "[d]uring the application period as defined in section 1160(a)(B)(1)(B) of this title any alient [sic] who has filed an application for adjustment of status within the United States as provided in section 1160(b)(1)(A) of this title pursuant to the provision of 8 C.F.R. section 210.1(j) is subject to paragraph (2) of this subsection."

issue work authorization to an applicant who files a "non-frivolous" claim. 8 C.F.R. § 210.4(b).

The regulations initially provided that the district director could only deny, through the LOs, those applications found to be frivolous—those that clearly failed to meet the statutory requirements—or those applications in which the applicant admitted fraud or misrepresentation in its preparation. 8 C.F.R. § 103.1(n)(2). District directors may now deny all ineligible applications at the LO level, 53 Fed.Reg. 10062, 10064 (March 29, 1988), but the regulations contemplate that only those applicants filing frivolous or fraudulent claims be denied a stay of deportation or exclusion and work authorization. 8 U.S.C. § 1160(d)(2) and (3)(B).

The applicant has the initial burden of proving by "a preponderance of the evidence" that s/he worked the requisite ninety man-days of seasonal agricultural services and may meet this burden by producing "sufficient evidence to show the extent of that employment as a matter of *just and reasonable inference.*" 8 U.S.C. § 1160(b)(3)(B)(i), (b)(3)(B)(iii) (emphasis added). Having done so, "the burden then shifts to the Attorney General to disprove the alien's evidence with a showing which negates the reasonableness of the inference to be drawn from the evidence." 8 U.S.C. § 1160(b)(3)(B)(iii).

The regulations provide that "[t]he sufficiency of all evidence produced by the applicant will be judged according to its probative value and credibility," and, to meet the burden of proof, an applicant must provide evidence of eligibility "apart from his or her own testimony." 8 C.F.R. § 210.3(b)(2). "Affidavits and other personal testimony by an applicant which are not corroborated, in whole or in part, by other credible evidence (including testimony of persons other than the applicant) will not serve to meet the applicant's burden of proof." 8 C.F.R. § 210.3(b)(3)).[6] If an employer or labor contractor has kept proper and adequate records, an applicant may meet the burden of proof by timely production of those records under regulations to be promulgated by the Attorney General. 8 U.S.C. § 1160(b)(3)(B)(ii); *but see* n. 10 *infra.* An alien may also meet the burden of proof by producing affidavits of agricultural producers, farm labor contractors, union officials, fellow employees, or other persons who have knowledge of the applicant's employment. 8 C.F.R. § 210.3(c)(3). The affiant must provide "a certified copy of corroborating records *or* state [his] willingness to personally verify the information provided." *Id.* (emphasis added).

## FACTS

The individual plaintiffs are applicants who have been denied SAW status. The plaintiffs Jean–Philippe, Vixama, Delva, and Henry were denied at the LO; the plaintiffs Angrand,[7] Lindor, Neus, Joseph, Tamayo, Vega, and Viera were denied by the RPF. Julien and Servilien were denied by the RPF and their denials affirmed on appeal by the LAU.[8]

---

**6.** The INS considers that an affidavit by the applicant is no different than his testimony and a recent amendment to the regulation omits an earlier reference to the applicant's affidavit to avoid confusion. 53 Fed.Reg. 10063 (March 29, 1988).

**7.** Plaintiffs Angrand and Dieudonne were both recommended for approval by the examiner who interviewed the applicant. Both cases were denied directly by William Chambers, director of the Texas RPF. There is no indication in these files that the INS had any reason to doubt the credibility of the affiant or that any material inconsistencies were found between the information provided in the application and in the interview. Gesner Desmornes, the farm labor contractor for whom both Plaintiffs Angrand and Dieudonne worked, testified as to his lack of payroll records and the fact that INS never contacted him to verify Plaintiffs' employment. Mr. Desmornes is not on the list of "suspect contractors" which Defendants used to identify questionable affidavits.

**8.** In fact, Plaintiff Julien responded to the RPF's decision that she was ineligible, because she has failed to submit additional corroborating evidence of her claim other than affidavits from her crew leader, by submitting additional evidence, including affidavits from the owner of the farm where she worked, her crew leader and a co-worker. She was denied by the LAU because she had not submitted payroll records.

The plaintiff HRC is a non-profit membership corporation organized under the laws of the state of Florida with its principal place of business in Miami. Its membership consists of Haitian refugees and its main function is to provide its membership with legal representation.

The Roman Catholic Diocese of Palm Beach through its component the plaintiff MRS is an affiliate of the United States Catholic Conference. MRS has been designated by the INS as a Qualified Designated Entity ("QDE") under section 245A(C)(2) of the IRCA, 8 U.S.C. § 1255a(c)(2) for the purpose of receiving the applications of farmworkers seeking SAW status. MRS serves the Diocese of Palm Beach including the geographical areas of Palm Beach, Martin, St. Lucie, Indian River, and Okeechobee Counties. The Diocesan program provides counseling to SAW applicants and receives applications for refugee status.

As of July 6, 1988, the INS District LOs servicing the state of Florida had received 77,861 SAW applications; 73,246 of those applicants had received interviews as of that date. Of those interviewed, 54,536 were recommended for approval and 14,524 for denial by the LO. The remaining 4,086 were denied at the LO.[9]

Of the 77,609 applicants as of July 1, 1988, 30,425 are Haitians who speak Creole. Although most SAW applicants do not speak English, the INS does not provide interpreters at SAW interviews. Non-English speaking applicants are expected to provide their own interpreters; the INS does not investigate the proficiency of any

interpreter beyond asking if they understand English and the language which they intend to interpret. The record of the interview does not identify the interpreter, his or her qualifications, or in fact whether an interpreter was used. The Okeechobee LO has never had a Creole speaking employee.

The interview is an extremely important step in the application process. It is the only face to face encounter between the applicant and the INS allowing the INS to assess the applicant's credibility. Yet, the INS does not record or prepare a transcript of the interview. Any inconsistencies between the applicant's documents and information elicited by the interviewer are to be noted on the worksheet, Form I–696, however, the plaintiffs' worksheets contain very little information pertaining to the interview or credibility determinations.

An applicant may only inspect this worksheet through a request pursuant to the Freedom of Information Act.

Applicants whose applications are determined to be non-frivolous but are recommended for denial at the LO level are usually not made aware of the recommendation or its basis.

Farm labor contractors and other agricultural employers often do not maintain accurate employment records. This makes it difficult and, in many cases, impossible for a farm worker to produce formal documentation.[10] Farm workers are likely to be paid in cash by farm labor contractors whose lists of workers are often incomplete.[11] Testimony suggested that in cases

**9.** Mr. William Chambers director of the RPF in Texas which adjudicates applications filed in the state of Florida testified that the denial rate in SAW cases is approximately 29%. The denial rate for applications filed for legalization under section 245A of IRCA is less than 5%.

**10.** Laws such as the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et seq.* and its predecessor, the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041 *et seq.* require farm labor contractors and other agricultural employers to maintain proper payroll records and provide pay receipts. Numerous cases brought either in this state or against Florida–based farm labor contractors demonstrate that violations of these recordkeep-

ing provisions remain widespread, if not pervasive. *See, e.g., Washington v. Miller,* 721 F.2d 797 (11th Cir.1983); *Rivera v. Adams Packing Ass'n, Inc.,* 707 F.2d 1278 (11th Cir.1983); *Lucien Bertrand, et al. v. Jimmie Lee Jorden,* 672 F.Supp. 1417 (M.D.Fla.1987); *Bohan v. Hudson,* 28 Wage & Hour Cas. 357 (BNA) (E.D.N.C.1987) [available on WESTLAW, 1987 WL 357]; *Haywood v. Barnes,* 109 F.R.D. 568 (E.D.N.C.1986); *Davis v. Williams,* 622 F.Supp. 386 (W.D.N.Y. 1985); *Donovan v. Anderson,* 24 Wage & Hour Cas. 1468 (BNA) (D.S.C.1981) [available on WESTLAW, 1981 WL 2311].

**11.** Many times payroll records maintained by farm labor contractors do not list all of the individuals who worked for that employer; of-

where records were kept, employers are frequently reluctant to produce them for fear of incriminating themselves for violations of federal law and subjecting themselves to civil penalties.

Congress specifically recognized this problem and provided a solution when it created the SAW program. If an employer or farm labor contractor kept proper and adequate records, the applicant's burden of proof "may be met by securing timely production of work records under regulations promulgated by the Attorney General." 8 U.S.C. § 1160(b)(3)(B)(ii).[12] When records are nonexistent or unavailable, the applicant can meet the burden of proof "by producing sufficient evidence to show the extent of that employment as a matter of just and reasonable inference. In such a case, the burden then shifts to the Attorney General to disprove the alien's evidence with a showing which negates the reasonableness of the inference to be drawn from the evidence." 8 U.S.C. § 1160(b)(3)(B)(iii).[13] Congress intended to encourage aliens to utilize the SAW program and to aid growers of perishable commodities often dependent upon a crew of illegal laborers to harvest crops. H.R. Conf.Rep. No. 99–1000, 99th Cong., 2d Sess. 85, 95, *reprinted in* 1986 U.S. Code Cong. & Admin.News 5840, 5850–51.

Wayne Joy and John Adamczyk both testified that the Defendants were directed to take a liberal view in determining whether the just and reasonable inference had been created, yet Defendants have not received any training or instructions as to the shifting burden of proof to be employed in SAW cases. Wayne Joy stated that the burden

---

ten, farm labor contractors and agricultural employers whose records are deficient are reluctant to make those records available to their employees or former employees because they fear they will be subject to civil penalties for violations of federal laws enacted for the protection of the farmworkers and for back social security and unemployment insurance taxes. A most common situation is when a husband and wife or, in some cases, an entire family, work together under a single name. Often, where workers are being paid on a piece-rate basis, several workers may work together filling a bucket or a bin (as in the case of citrus) for which they receive a ticket. The work may be recorded only under the name of the worker who turns in the tickets at the end of the day. In some cases, the work done by four or five workers may be listed under a single name. Often, the work of alien workers who lack valid social security numbers is recorded under the name of a former U.S. worker with a valid number. Unlike the situation in which a worker is using an alias or a false social security number, workers in this situation may be unaware that their work is being improperly recorded. Sometimes certain workers are not listed at all on payroll records furnished by the contractor to the farm operator. In some cases records which once existed were lost or stolen. In some cases, records are simply not kept.

12. Although only three and one-half months remain in the application period, the Attorney General has not promulgated any regulations which provide for the timely production of this proof. On May 31, 1988, the District Court for the Eastern District of California issued a preliminary injunction ordering Defendant Nelson to forthwith promulgate regulations which shall provide for the timely production of employ-

ment records in accordance with IRCA. *United Farmworkers of America (AFL–CIO et al., v. INS et al.,* Civil Action No. 87–1064-LKK (E.D.Cal. May 31, 1988)). As of July 21, 1988, Defendants had not promulgated any regulations.

13. Congress intended that for purposes of interpretation of the requirements of section 210, 8 U.S.C. § 1160(b)(3)(B) the standards embodied in Fair Labor Standards case law govern. The House Report noted:

in a line of cases leading from *Anderson v. Mt. Clemens Pottery Co.,* 66 S.Ct. 1187 (1946), (including cases which specifically address the unique documentation of work history problems in the agriculture, such as *Beliz v. W.H. McLeod Co.,* 765 F.2d 1317 (1985)), courts have dealt with fact patterns involving employee loss of records, destruction or falsification of records by employers, and other difficult circumstances where precise evidence of hours worked is lacking.

*This problem is compounded in agriculture,* where pay records may only show piece rate units completed. While this Act will require evidence of hours worked, the lack of hourly records for agricultural employees (which could result from small employer exemptions from wage and hour laws as well as from employment by farm labor contractors or others whose recordkeeping practices are deficient), has led the Conferees to conclude that fairness dictates they create a presumption in favor of worker evidence, unless dispoved [sic] by specific evidence adduced by the Attorney General.

H.R.CONF.REP NO. 99–1000, 99th CONG., 2d SESS. 85, 97, *reprinted in* 1986 U.S. CODE CONG. & ADMIN. NEWS 5840, 5853 (emphasis added).

required to meet the just and reasonable inference is identical to the burden required to meet the nonfrivolous standard.

On May 1, 1987, the INS issued regulations allowing applicants to establish qualifying employment by submitting affidavits of growers, foremen, farm labor contractors, and fellow employees.[14] The regulations require the affiant to provide a certified copy of corroborating records or state his or her willingness to verify personally the information contained therein.[15]

Prior to the application period, representatives of several Qualified Designated Entities ("QDEs") met with the Deputy Commissioner of the INS in charge of the SAW program and developed an affidavit for use by applicants to satisfy the requirements of the regulation. The I-705 "Affidavit Confirming Seasonal Agricultural Employment of an Applicant for Temporary Residence Status Under Section 210 of the Immigration and Nationality Act," is designed to provide information of when, where, and in what crops the applicant labored. The form, which recites that the affiant is "willing to personally confirm this information, if requested" and is to be signed under penalty of perjury, was published in the Federal Register at 52 Fed.Reg. 16195 (May 1, 1987).

During the first several months of the program, affidavits sufficed to corroborate the applicant's claim of employment. Suspicion of widespread fraud in the application procedure led the LOs to demand corroborative evidence, such as payroll records, pay stubs, and rent receipts, and to deny many applications accompanied only by the form I-705 affidavit.

According to defendants' testimony, an affidavit would not be sufficient if the weight of the affidavit comes into question because of its connection to fraud, inconsistencies, or other credibility questions. The defendants' standard for judging credibility questions may hinge upon the fact that applicants often cannot identify the grower, the name of the farm, or the area in which it is located.[16] Farm workers may only know the name of their crew leader or labor contractor who collects them from a preappointed spot in the morning and redelivers them in the evening. Therefore "inconsistencies" between the interview and the written application may develop because an applicant improperly identifies a "growing area" or cannot name an employer. The interview is the sole means of judging an applicant's credibility.

The Miami District developed a list of farm labor contractors and immigration consultants suspected by the INS of being involved in fraudulent applications. The list was given to each interviewer for use in evaluating individual applications. Contractors or others whose names appeared on the "list" were often not aware of the fact nor were they provided with an opportunity to rebut the "suspected" fraud.

Although applicants should be made aware of adverse evidence considered during the evaluation of their applications, 8 C.F.R. § 103.2(b)(2), applicants were not told if an affiant who supported the alien's applications appeared on the list nor were they given an opportunity to supplement their applications to support a suspect affidavit.[17] Applicants were not told if or why

---

**14.** 8 C.F.R. § 210.3(c)(3). "The weight and probative value of any affidavit accepted will be determined on the basis of the substance of the affidavit and any documents which may be affixed thereto which may corroborate the information provided." *Id.*

**15.** Defendants testified, however, that in the majority of cases they do not contact the affiant/crew leader to verify the information contained in the I-705 and supporting crew leader affidavits. Similarly, Wayne Joy testified that crew leader affidavits are generally not considered as credible evidence if the farm owner has no independent record regarding the SAW applicant.

**16.** Applicants have been denied at the local office because of an inconsistency between the dates the applicants claimed to have worked and a chart or map showing harvest dates to which the examiner referred.

**17.** The regulations contemplate the possibility of a second interview required by the RPF "if the alien in the second interview can establish eligibility for approval." 8 C.F.R. § 103.1(n)(2). No evidence suggested that any applicant was given a second interview.

their applications were recommended for denial.[18]

Plaintiffs Henry and Jean–Philippe, denied after their initial interview because their affiant appeared on the list of "suspected" labor contractors, were not given the opportunity to rebut the adverse evidence. In some cases, all applications accompanied by an affidavit bearing the name of a contractor or other individual whose name appeared on the "list" were denied for failure to produce corroborative evidence, despite the fact that some of those who appeared on a list were genuine crewleaders whose names had been used by another. In such a case, though the applicant had actually worked for the suspected crewleader, his or her application was denied merely because the crewleader's name was under suspicion. William Chambers testified that form notices of denial were issued to hundreds possibly thousands of applicants. The denial stated that the "affidavits were signed by the same affiant and were not substantiated by any additional credible evidence such as piecework receipts or employers' daily records." [19]

A wire addressed to all district directors, regional legalization officers, and the Legalization Appeals Unit, dated April 11, 1988, instructed the parties that 8 C.F.R. § 103.2(b) requires that applicants be advised of adverse evidence considered by the INS and that they be given an opportunity to present evidence to rebut it prior to a decision. The directive provided that an I–72 notice be sent to any applicant whose application was to be denied because of adverse evidence and that the applicant be given thirty days to overcome its inference. But no measures were taken to correct denials effected without informing the applicant of adverse evidence that occurred prior to issuance of the directive.[20]

## JURISDICTION

The defendants challenge the jurisdiction of the court without which the remainder of this decision would be fruitless. Therefore this court, having considered the question as a threshold issue, finds jurisdiction vested for adjudication of this matter.

The defendants note that both administrative and judicial review of INS decisions on SAW applications are provided for by IRCA. Title 8 U.S.C. § 1160, the IRCA provision addressing legalization for SAW applications, expressly states that sole judi-

---

18. In addition to the lists of suspect individuals utilized at the LO level, Defendant Chambers testified that at the RPF, examiners received reports from the Document Analysis Unit ("DAU") as well as other agencies concerning SAW applicants and affiants suspected of fraud. The DAU regularly prepares reports or bulletins which go to each of the examiners as well as to all LO's in the Region. (Testimony of William Chambers). In general, cases in which fraud was suspected were not denied on the basis of fraud or misrepresentation but on the grounds that the applicant had failed to meet his or her burden of proof. Thus, applicants were not specifically informed that the basis of the denial was evidence concerning a contractor, the nature of that evidence, or of any other evidence which adversely affected their cases.

19. Plaintiffs Angrand, Cadet, Dieudonne, Neus, Pierre, Tamayo and Vega each received an identical form denial which contained the same two paragraphs:

In support of your application, you have submitted a Form I–705, Affidavit Confirming Seasonal Agricultural Employment, and a written affidavit to establish your eligibility. However, these affidavits were signed by the same affiant, and *were not substantiated by any additional credible evidence such as piecework receipts or employers' daily records.*

In the *Matter of Brantigan,* 11 I & N Dec. 493 (BIA 1966), it was held that the burden of proof is upon the alien to establish his or her eligibility for a benefit. Pursuant to Title 8, Code of Federal Regulations, Part 210.3(b)(1), the burden of establishing eligibility for the benefit you seek falls upon you. You have failed to meet this burden.

(emphasis added).

20. The wire did specify that any denial based upon adverse evidence not supplied to the applicant and prior to issuance of an I–72 notice would be subject to reopening upon a motion by the applicant. The regulations, however, provide no mechanism to reopen and in fact state: "Motions to reopen a proceeding or reconsider a decision under Part 210 or 245a of this chapter *shall not be considered.*" 8 C.F.R. § 103.5 (emphasis added). Although section 103.5 allows the Associate Commissioner Examinations or the Chief of the Administrative Appeals Unit to *sua sponte* reopen any proceeding under Part 210, no effort to reconsider any decision rendered prior to April 11, 1988, has been made.

cial review of a denial of SAW status occurs during the applicant's deportation case. It provides:

> There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

> \*    \*    \*    \*    \*    \*

> There shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title.

8 U.S.C. § 1160(e)(3)(A).

The defendants urge that Congress deliberately structured the system in a way to exclude participation by district courts. Under IRCA, aliens cannot contest the denial of their SAW applications unless and until the INS institutes deportation proceedings against them.[21] District courts lack jurisdiction to adjudicate deportation proceedings which are initially tried by an immigration judge. 8 U.S.C. § 1252(b); 8 C.F.R. §§ 1.1(1) and 242.8. Appeal of an adverse decision by the immigration judge goes to the Board of Immigration Appeals. 8 U.S.C. § 1105a(c); 8 C.F.R. § 3.1(b). Only after exhausting these administrative remedies may an alien seek review and his appeal is then directed to the courts of appeals. 8 U.S.C. § 1105a(a)(2). It cannot be disputed that "petition for review in the Court of Appeals 'shall be sole and exclusive procedure for the judicial review of all final orders of deportation....'" *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2777, 77 L.Ed.2d 317 (1983) (quoting Immigration and Nationality Act § 106(a), 8 U.S.C. § 1105a(a)). Therefore, had the plaintiffs chosen to challenge denial of the individual applications, this court would be without power to address the complaint. The plaintiffs' complaint, however, does not challenge any individual determination of any application for SAW status but rather attacks the manner in which the entire program is being implemented, allegations beyond the scope of administrative review.

In *Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir. Unit B 1982), the Fifth Circuit considered a class action suit brought by Haitians seeking political asylum in the United States. The complaint challenged the expedited administrative procedure employed by the INS in processing the asylum applications of members of the plaintiff class. The government argued the same grounds that it is arguing before this court, that is: (1) exclusive jurisdiction is conferred upon the courts of appeals under 8 U.S.C. § 1105a(a), and (2) though the court has jurisdiction, it should decline to exercise it because the plaintiffs failed to exhaust their administrative remedies. The court in *Smith* recognized congressional intention to give the courts of appeals exclusive jurisdiction over all final orders of deportation, but the court also highlighted the narrow exception that allows jurisdiction to the district courts "insofar as the [complaint] set[s] forth matters alleged to be part of a pattern and practice by immigration officials to violate the constitutional rights of a class of aliens" under its federal question jurisdiction. 676 F.2d at 1033. The court stated that to the extent that the "irregularities may provide a basis for reversal of an individual deportation," the court of appeals still has exclusive jurisdiction to review the alleged procedural irregularities. *Id.* The court drew a distinction "between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent that it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged." *Id.*

In *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984), the Eleventh Circuit considered a class action on behalf of Haitian aliens detained in facilities pending final determination of their asylum cases. The plain-

---

**21.** Section 210(e), 8 U.S.C. § 1160(e)(2) provides for a single level of administrative appellate review of applications and restricts judicial review to the context of review of an order of exclusion or deportation.

tiffs alleged violations of the Administrative Procedure Act and discriminatory detention. The court stated that "executive officials 'function as agents of Congress in enforcing the law.... If such officers depart from the zone of authority charted in the statute they act illegally and their actions can be corrected in the courts.'" 727 F.2d at 966 (citations omitted).

In the case before this court, the plaintiffs allege that the defendants have exceeded their authority by illegal implementation of stated congressional intent. To deny jurisdiction would be to allow illegal agency action to go unchallenged. *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (1932); *Mahler v. Eby*, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924); *Gegiow v. Uhl*, 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (1915). This court does not, by this decision, intend to widen the narrow holding in *Smith* but rather finds that the present case fits within that narrow exception.[22]

## STANDING

■ The defendants assert that the organizational plaintiffs lack standing because they have not established a cognizable injury nor have they established the causation elements required to find a case or controversy. To establish standing, "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)), "and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758 (quoting

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976) (footnote omitted)). The exercise of judicial authority is thus limited to litigants who are able to demonstrate "injury in fact" resulting from the complained of behavior. *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759.

The Supreme Court has also recognized that, beyond constitutional requirements, there exist certain prudential principles that require the court to refrain from adjudicating " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin*, 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (footnote omitted)). Finally, the plaintiffs' complaint must fall within "the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (footnote omitted)).

The organizational plaintiffs before this court have satisfied both constitutional and prudential requirements for standing and thus their claims are cognizable. The constitutional requirements encompass three components: (1) injury in fact, (2) causation, and (3) redressability. Numerous courts have found standing based upon allegations similar in scope to those presented by the plaintiffs HRC and MRS.

HRC has alleged that the "[d]efendants' refusal to recognize that such persons [HRC's members] are eligible under IRCA both directly and indirectly injures HRC. It directly injures the organization because it makes HRC's work of assisting the Haitian refugee community more difficult and

---

**22.** Apart from the federal question jurisdiction raised by the allegation of any constitutional violations is the question of whether an agency deviated from its own regulations and procedures, an issue justifying judicial relief in a case

otherwise properly before the court. *See Haitian Refugee Center v. Smith*, 676 F.2d at 1041 n. 48 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954)).

results in the diversion of HRC's limited resources away from members and clients having other urgent needs." Complaint at ¶ 17. HRC also alleges an indirect injury through the adverse effect upon its members. *Id.* The plaintiff MRS is a QDE under IRCA authorized to provide counseling to aliens about the legalization process and to assist them in obtaining documentation. It also receives applications and fees from aliens and is reimbursed by the INS for counseling and filing services. MRS alleges that the defendants' behavior has discouraged otherwise eligible SAW applicants from seeking counseling and/or filing their claims and MRS is prevented from fulfilling its basic mission of assisting aliens to qualify under IRCA. *Id.* at ¶ 18.

In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court addressed the standing of an organization, Housing Opportunities Made Equal ("HOME"), whose purpose was " 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area.' " *Id.* at 368, 102 S.Ct. at 1118 (quoting App. at 13, ¶ 8). The organizational plaintiff's activities included operation of a housing counseling service and the investigation and referral of complaints of housing discrimination. 455 U.S. at 368, 102 S.Ct. at 1118. The Court found that:

> "If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests...."

*Id.* at 379, 102 S.Ct. at 1124. The plaintiff HOME's complaint alleged simply that it "has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *Id.* at 379, 102 S.Ct. at 1124.

In *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931 (D.C.Cir.1986), the court, recognizing the standard set by the Supreme Court in *Havens,* found that the appellant, whose function was, through informational, counseling, referral, and other services, to improve the lives of elderly citizens, had sufficient standing to press its claim. As in the case before this court, the appellant in *Action Alliance* alleged "inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." 789 F.2d 938 (footnote omitted).

HRS and MRS, whose very existence is devoted to assisting Haitian refugees through legal counseling and referral, have concrete programmatic concerns that form an adequate basis for alleging an injury in fact and thus fulfill the primary constitutional requirement for standing.[23] But, though a plaintiff demonstrates a very real injury, it may lack standing because of the absence of causation or redressability. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. at 40–46, 96 S.Ct. at 1925–28. The causal connection in the present case cannot be deemed "speculative." *See id.* at 45, 96 S.Ct. at 1927. The defendants in the case before this court have actual control over the implementation of the SAW program and their alleged mishandling is the very basis for the plaintiffs' complaint. Finally, because the defendants control implementation of the regulations, requiring them to recognize and abide by these regulations would provide the plaintiffs with the remedy they seek and resolve

**23.** "That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not affect the nature of the injury suffered, *Arlington Heights v. Metropolitian Housing Dev. Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), and accordingly does not deprive the organization of standing." *Havens,* 455 U.S. at 379 n. 20, 102 S.Ct. at 1125 n. 20.

the alleged injury.[24] Therefore the plaintiffs meet the Article III requirements for standing to pursue this action.

The dispute before this court also fulfills the prudential standing requirements outlined in *Valley Forge.* 454 U.S. at 475, 102 S.Ct. at 760. The interests at stake are not " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches," *Id.* (quoting *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2205), but rather are particularized concerns that affect an identifiable group of people. Finally, HRC claims that defendants' behavior makes it increasingly difficult to render the legal assistance that forms the core of its functions. HRC's interest in aiding the applicants' legalization process falls squarely within the "zone of interests" that is protected by the statute. *See, e.g., Action Alliance,* 789 F.2d at 939 (interests as promotion of knowledge, enjoyment, and protection of rights created by a statute are in the zone of interests); *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977) (environmental group's participation in passage of the statute); *Consumers Union v. Federal Trade Commission,* 691 F.2d 575, 576–77 (D.C.Cir. 1982) (en banc) (consumer groups may challenge FTC rules that withhold used car information from consumers).

## CLASS CERTIFICATION

Fed.R.Civ.P. 23(a) lists four prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(2) allows a class action when the requirements of 23(a) have been met and "the

party opposing the class action has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding relief with respect to the class as a whole."

The defendants have not challenged the adequacy of the representative parties' protection of the class interests and so this court will address only those challenges to class certification that contend: (1) the numerosity allegations are too vague to be credited; (2) the plaintiffs have not demonstrated that they meet the commonality and typicality requirements; and (3) the plaintiffs never clearly described the class they seek to have certified. This court concludes that the defendants' arguments lack merit for the following reasons.

■ The defendants correctly state that the mere allegation that a class is too numerous to make joinder practicable is insufficient to satisfy this basic requirement. *See, e.g., Fleming v. Travenol,* 707 F.2d 829, 833 (5th Cir.1983). A court must look to the specific facts of each case to determine the number of potential class members and whether joinder is possible. *See Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980). Defendants err, however, by applying that rationale in this context. In their complaint, the plaintiffs define their action as one that "challenges the practices, policies and procedures of the INS for determining Lawful Temporary Resident status under the SAW program." The challenge is based on two grounds: (1) that the plaintiffs have been cast with an improper burden of proof in establishing their right to a change in residence status; and (2) that the INS has failed to promulgate regulations to ensure that the applicants are able to secure needed records to establish their claims.

The plaintiffs Angrand, Cadet, Dieudonne, Neus, Pierre, Tamayo, and Vega each received an identical form denial, *see*

---

**24.** The court in *Action Alliance* noted that "dismissal on the pleadings is inappropriate, even if 'the extreme generality of [a] complaint' leaves 'injury in fact' in doubt, when standing requirements may be satisfied upon affording plaintiffs 'an opportunity to make more definite the allegations of the complaint.' " 789 F.2d at 938 (quoting *Havens,* 455 U.S. at 377–78, 102 S.Ct. at 1123–24).

n. 14 *supra,* which merely stated that they had failed to submit sufficient credible evidence to substantiate their claims because their affidavits were not accompanied by "piecework receipts or employers' daily records." These form denials, which the plaintiffs allege were defective by imposing an improper burden of proof and by failing to state with particularity the reasons for denial were, according to defendants' witness William Chambers, issued to hundreds possibly thousands of applicants. Therefore the persons who have been affected by what the plaintiffs allege is illegal implementation of congressional policy number in the hundreds, possibly thousands, and therefore the numerosity allegations have been sufficiently established. The very number of the persons affected as well as the nature of their work and their economic means makes joinder impracticable.[25] *See, e.g., Jean v. Nelson,* 727 F.2d 957, 961 n. 2 (11th Cir.1984) (class certified by the district court was comprised of "[a]ll Haitian aliens who have arrived in the Southern District of Florida on or after May 20, 1981, who are applying for entry into the United States and also are presently in detention pending exclusion proceedings at various INS detention facilities, for whom an order of exclusion has not been entered and who are either: (1) Unrepresented by counsel; or (2) Represented by counsel pro bono publico assigned by the Haitian Refugee Volunteer Task Force of the Dade County Bar Association") (quoting *Louis v. Nelson [Louis III],* 544 F.Supp. 973, 984 (S.D.Fla.1982)); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1026 n. 1 (5th Cir. 1982) (class certified by the district court included "all Haitian nationals who have applied for political asylum on or before May 9, 1979 under 8 C.F.R. § 108, and whose applications were or may be denied by the INS District Director or his designee in INS District Office No. 6, Miami, Florida").

■ The defendants challenge the plaintiffs' contention that there exist common questions of law or fact and that the representative parties exhibit claims that are typical of the class as a whole. Fed.R.Civ. P. 23(a)(2). It must be noted that this provision does not require that all of the questions of law and/or fact raised by the case be common to all the plaintiffs. *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 532 (5th Cir.1978); 7 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 1763 (1986) (hereinafter Wright & Miller). Class actions seeking injunctive or declaratory relief—as in the instant case—by their very nature present common questions of law or fact. 7 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure: Civil § 1763. Commonality also exists when plaintiffs allege that a defendant has acted or is acting uniformly regarding a class. *Haitian Refugee Center v. Smith,* 676 F.2d at 1033. The class of plaintiffs in this case allege that they were denied temporary residence status because the defendants imposed an illegal burden of proof that the applicants were unable to meet. Such an allegation is sufficient to meet the commonality and typicality requirements of Rule 23(a)(2) and (3). *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986) (claims actually litigated must simply be those fairly represented by the named plaintiffs).

■ Finally, the court rejects the defendants' argument that the plaintiffs did not adequately describe the class. The defendants' very requirements for eligibility under the SAW program identify the class members with sufficient particularity for this court to determine whether a SAW applicant is a member. Therefore the class certified shall consist of all persons who have applied for, or will apply for, adjust-

---

**25.** The question of what constitutes impracticability depends on the particular circumstances in each case. *See* 7 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 1782. In *Armstead v. Pingree,* 629 F.Supp. 273 (D.C.Fla.1986), the court found joinder impracticable particularly in light of the class

members' economic resources, handicap, and confinement. In the instant case, the putative class members are migrant workers whose economic means militate against individual suits. In addition, the nature of the work requires that its laborers follow the agricultural seasons.

ment to lawful residence under the Special Agricultural Worker ("SAW") program within the eighteen month period and who have been or will be denied such status by the INS within this circuit because of the defendants' unlawful practices and policies.

## PRELIMINARY INJUNCTION

The plaintiffs seek preliminary injunctive relief under Fed.R.Civ.P. 65(a), the purpose of which is to prevent irreparable injury and preserve the court's ability to render a meaningful decision on the merits. *United States v. Alabama,* 791 F.2d 1450, 1459 (11th Cir.1986). Because the application period under the SAW program terminates on November 30, 1988, preliminary injunctive relief is necessary to ensure that a remedy will be available. *Id.* (citing *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1424 (11th Cir.1984)). With full understanding that a preliminary injunction is an extraordinary and drastic remedy, the grant of which is exceptional, this court, nevertheless, finds that the circumstances before it require such relief.[26]

To be entitled to injunctive relief, the plaintiffs must establish four factors: (1) substantial likelihood that they will prevail on the merits; (2) they will suffer irreparable injury if the injunction is not granted; (3) the threatened harm to the plaintiffs outweighs the potential harm to the defendants; and (4) the public interest will not be harmed if the injunction should issue. *United States v. Alabama,* 791 F.2d at 1459 n. 10; *Johnson v. Department of Agriculture,* 734 F.2d 774, 781 (11th Cir. 1984); *Cate v. Oldham,* 707 F.2d 1176, 1185 (11th Cir.1983); *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983).

### *Likelihood of Success*

■ The plaintiffs allege that the defendants have violated the applicants' due process rights under the Fifth Amendment by the manner in which they are implementing the SAW program. The plaintiffs cite what they allege to be an improper burden of proof in establishing eligibility under the program, defendants' failure to publish new rules governing SAW applications, practice of denying non-frivolous claims at the Los, and failure to advise applicants of specific reasons for denial of their applications.

The Supreme Court has recognized that a constitutionally protected liberty or property interest may be created by positive rules of law enacted by the federal government and creating a substantial entitlement to a particular government benefit. *Haitian Refugee Center v. Smith,* 676 F.2d at 1038. In *Smith,* the Fifth Circuit found a constitutionally protected right to petition the federal government for political asylum in federal regulations establishing asylum procedures. In the case before this court, the applicants have a constitutionally protected right to seek SAW status under IRCA and the resultant regulations. *Smith* recognized a problem that also faces this court—that fundamental fairness, the very essence of due process, is violated when the government creates a right to petition and then makes it utterly impossible to exercise that right. 676 F.2d at 1039.

Thus the individual plaintiffs have been afforded the right to seek temporary residency in this country through the congressionally created SAW program. Congress intended that the program be liberally applied to encourage undocumented farm workers to come forward and seek legalization. The program was created in a way to circumvent to well recognized problem of documentation that exists for migrant worker. The evidence before this court strongly suggests that, despite congressional directives, applicants are being required to produce exactly what they cannot, i.e., payroll records.

The Supreme Court has repeatedly emphasized that, not only must an aggrieved party be given the opportunity to "some form of hearing" prior to being deprived of a protected interest, the hearing must be

---

**26.** The grant or denial is a decision within the sound discretion of the district court. *Lambert,* 695 F.2d at 539 (citing *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 332 (5th Cir.1981)).

conducted "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

The applicants in this case were expected to defend their applications against inferences of "suspected fraud," "lack of credibility," or "inconsistencies" to interviewers who did not speak their language and were not schooled in their culture. Applicants were not advised when their applications were recommended for denial, and were deprived of the opportunity to rebut any adverse inferences drawn from their interviews. Hundreds perhaps thousands of applicants received denial notices stating only that submitted affidavits were "not substantiated by any additional credible evidence such as piecework receipts or employers' daily records." They were misinformed about the time within which they were required to appeal an adverse decision, and not informed at all of where to submit an appeal. It is difficult to find that the above circumstances constituted a "meaningful" opportunity to be heard.

Under section 210(a)(1) of the INA, as amended by IRCA, 8 U.S.C. § 1160(a)(1), the Attorney General *"shall"* adjust the status of an alien who creates a just and reasonable inference of eligible employment and meets the other requirements of the statute. The Attorney General must also grant an application when a just and reasonable inference is shown unless the reasonableness of the inference is negated a "showing." 8 U.S.C. § 1160(b)(3)(B)(iii). Congress intended that the standards outlined in the case law interpreting the Fair Labor Standards Act be applied to the SAW program. *See* n. 13 *supra. See, e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946) (employee must produce sufficient evidence from which the amount of time worked may be determined as a just and reasonable inference and the burden then shifts to the employer to negate the reasonableness of the inference).[27] In *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1330–31 (5th Cir.1985), the court recognized that a just and reasonable inference may be established through testimony of other employees. *See also Castillo v. Givens,* 704 F.2d 181 (5th Cir.1983); *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825 (5th Cir.1973). In *Williams v. Tri–County Growers, Inc.,* 747 F.2d 121, 129 (3rd Cir.1984), the court, in a footnote, chided the defendants who erroneously contended that no case has permitted the testimony of plaintiffs alone to satisfy the burden *Anderson* places upon employees by pointing to *Marshall v. Van Matre,* 634 F.2d 1115, 1119 (8th Cir. 1980) and *Mitchell v. Williams,* 420 F.2d 67, 70–71 (8th Cir.1969). *See Williams,* 747 F.2d at 128 n. 13. The court, in rejecting the defendant's argument that testimony alone was insufficient to create a just and reasonable inference, remarked that when "employees are migrant farm workers, it is difficult to imagine what other evidence the defendant would require [the farm workers] to produce." 747 F.2d at 128 n. 13.

The defendants in the present case are rejecting the "just and reasonable" inference established by the applicants' proffered affidavits on the basis of arbitrary credibility determinations that rest partly on suspicion of widespread fraud. The statute, however, requires that the applicant's "just and reasonable inference" be countered by "a showing that negates the reasonableness of the inference," and not the mere suspicion of wrongdoing.

### Irreparable Injury

■ The key word in the determination of the injury that will result from a denial of a motion for preliminary injunction is "irreparable." *United States v. Jefferson,* 720 F.2d 1511 (11th Cir.1983). An injury is "irreparable" for purposes of a preliminary injunction only if it cannot be undone through monetary remedies. *Cate v. Oldham,* 707 F.2d 1176; *Deerfield Medical Center,* 661 F.2d 328. *See also Jets Ser-*

---

27. In *Smith,* the court conceded that the right to petition for asylum is "a fragile one," but nevertheless a valuable one to its possessor. 676 F.2d at 1039. Likewise, in this case, the right is invaluable to the applicants seeking residency in this country.

*vice Inc. v. Hoffman,* 420 F.Supp. 1300 (D.C.Fla.1976) (a recognized, legitimate interest that will vanish if not preserved constitutes irreparable injury).

The injury to the individual plaintiffs and the class involves a denial of temporary residency that will be adjusted to permanent residency within two years. This court cannot say that any monetary remedy would compensate for the loss of the benefits afforded by United States residency. The opportunity offered to the applicants is of limited duration, limited by the eighteen month application period ending on November 30, 1988.

SAW applicants whose applications were denied at the LO and those applicants who failed to appeal timely denials because of improper notices lack work authorization and thus a means of livelihood. The plaintiffs, HRC and MRS are unable to provide their members with the services that form the core of the organizations' functions.

### *Balance of Interests*

■ The possible harm to the plaintiffs must be balanced against the possible harm to the defendants. In a case which involves a government agency, this factor is often intertwined with the public interest consideration. *See Baker v. School Board of Marion County,* 487 F.Supp. 380, 383 (M.D.Fla.1980). The defendants allege that the administrative burden that will result from the grant of injunctive relief outweighs the interests at stake. This court does not agree. Although it is true that the relief the plaintiffs seek involves necessary administrative expense and time, the loss to the plaintiffs is of such a magnitude to justify the additional burden. This court may use a sliding scale analysis, in which a strong showing of one factor may lessen the requirement for another. In addition, the overriding prerequisite is irreparable injury without an adequate remedy at law. *Baker v. School Board,* 487 F.Supp. at 383 (citing *Sampson v. Murray,* 415 U.S. 61, 88–89, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974)). Plaintiffs who have been improperly denied a change of status have suffered a very great loss as will those possibly denied in the future. When the program concludes on November 30, 1988, the chance to qualify under the program is gone. There exists no remedy at law that this court is aware of to compensate for this loss and therefore this court finds that the injunctive relief requested by the plaintiffs is proper.

It is thus the considered decision of this court that the class of plaintiffs described in this decision be certified and the injunctive relief be granted. An appropriate preliminary injunction order shall be entered.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE is before the court on the plaintiffs' motion for a preliminary injunction. After reviewing all of the submitted memoranda, after an extensive hearing, and after reviewing post hearing memoranda, it appearing that the plaintiffs and members of their class will suffer irreparable harm absent the preliminary relief sought because they will be denied the ability to earn a living and to support themselves and will be subject to deportation by the defendants, it is

ORDERED AND ADJUDGED as follows:

The defendant Alan C. Nelson, as Commissioner of Immigration and Naturalization Service, and the United States Immigration and Naturalization Service ("INS") and all persons acting by, through, or subject to their control or supervision, shall comply with the following:

(1) In those case in which the INS issued notices of denial which did not comply with the requirements of 8 C.F.R. § 103.3(a) because they did not advise the applicant of the correct procedure for appeal or did not provide specific reasons for denial, the INS shall vacate the denials and issue new notices of denial which comply with 8 C.F.R. § 103.3(a);

(2) In those cases in which the INS considered evidence adverse to the applicant of which the applicant was unaware, contrary to 8 C.F.R. § 103.2(b)(2), the INS shall vacate the denials, afford the applicant an opportunity to examine the adverse evidence, to rebut it, and to offer additional evidence before rendering a decision;

(3) In those cases which the INS denied based in whole or in part on the fact that the applicant failed to submit payroll records or piecework receipts, the INS shall vacate the denials and reconsider the cases in light of the proper standard of proof which will require the government to present evidence to negate the just and reasonable inference created by the affidavits and other documents submitted by the applicant;

(4) The INS shall vacate those denials issued by the Legalization Offices during the period June 1, 1987, to March 29, 1988, unless the government can show that the applications were clearly frivolous based upon the documentation submitted by the applicant or that the applicant admitted fraud or misrepresentation in the application process;

(5) The INS shall issue temporary work authorization to all class members pending the final outcome of the proceedings in this case and a final decision on the merits of their individual cases;

(6) The Legalization Offices shall maintain competent translators, at a minimum, in Spanish and Haitian Creole, and translators in other languages shall be made available if necessary;

(7) The INS shall afford the applicants the opportunity to present witnesses at the interview including but not limited to growers, farm labor contractors, co-workers, and any other individuals who may offer testimony in support of the applicant;

(8) The interviewers shall be directed to particularize the evidence offered, testimony taken, credibility determinations, and any other relevant information on the form I-696.

This order shall remain in effect pending further order of this court. The plaintiffs are directed to post security in the amount of $500 by 4 p.m. on August 25, 1988, in accordance with Fed.R.Civ.P. 65(c).